This Opinion Is a
Precedent of the TTAB

Mailed: June 28, 2021

UNITED STATES PATENT AND TRADEMARK OFFICE

————

Trademark Trial and Appeal Board

————

*The Coca-Cola Company*
*v.*
*Meenaxi Enterprise, Inc.*

————

Cancellation Nos. 92063353 & 92064398

Holly Hawkins Saporito, Lauren R. Timmons, and Marcos Alvarez
     of Alston & Bird LLP for The Coca-Cola Company.

John M. Rannells of Baker and Rannells, PA
     for Meenaxi Enterprise, Inc.

————

Before Taylor, Lynch, and Larkin
     Administrative Trademark Judges.

Opinion by Lynch, Administrative Trademark Judge:

## I.   Background

   Petitioner The Coca-Cola Company seeks to cancel the following two registrations

owned by Respondent Meenaxi Enterprise, Inc.:[1]

---

[1] These cancellation proceedings began as a single proceeding involving two registrations.
The Board subsequently granted the parties' motion to divide, resulting in two separate
proceedings. 12 TTABVUE. However, the Board later noted that the parties filed "nearly

THUMS UP in standard characters[2] for:

> Colas; Concentrates, syrups or powders used in the preparation of soft drinks; Soft drinks, namely, sodas in International Class 32.

LIMCA in standard characters[3] for:

> Concentrates, syrups or powders used in the preparation of soft drinks; Soft drinks, namely, sodas in International Class 32.

While the Petition to Cancel included numerous grounds for cancellation, the only one Petitioner pursued at trial is that Respondent has misrepresented the source of the goods on which the marks are used, under Trademark Act Section 14(3), 15 U.S.C. § 1064(3).[4] The other pleaded claims that Petitioner did not address in its briefing are waived. *Joel Gott Wines LLC v. Rehoboth Von Gott Inc.*, 107 USPQ2d 1424, 1426 n.3 (TTAB 2013) (opposer's pleaded descriptiveness claim not argued in brief deemed

---

identical motions and briefs" in each proceeding, and that the cases "involve[d] the same parties and common questions of law and fact," so the Board consolidated the proceedings. 37 TTABVUE 7. Except where otherwise indicated, citations refer to TTABVUE, the Board's online docketing system, and references are made to the filings, in the parent case, Cancellation No. 92063353. *See Turdin v. Trilobite, Ltd.*, 109 USPQ2d 1473, 1476 n.6 (TTAB 2014).

[2] Registration No. 4205598 issued September 11, 2012 on the Principal Register from an underlying use-based application filed February 4, 2012. A Section 8 declaration has been accepted.

[3] Registration No. 4205597 issued September 11, 2012 on the Principal Register from an underlying use-based application filed February 4, 2012. A Section 8 declaration has been accepted. The registration includes a statement that "[t]he wording Limca has no meaning in a foreign language."

[4] *See also* 113 TTABVUE 6 n.1 (Petitioner's Reply Brief, stating, "[Petitioner] agrees with [Respondent] that [Petitioner's] trial brief is focused on its Section 14(3) claim."); 110 TTABVUE 9 (Respondent's Brief, asserting that Petitioner waived claims not addressed in its Brief).

waived); *Knight Textile Corp. v. Jones Inv. Co.*, 75 USPQ2d 1313, 1314 n.4 (TTAB 2005) (pleaded dilution ground not pursued on brief deemed waived).

Petitioner contends that Respondent "registered [Petitioner's] internationally famous THUMS UP and LIMCA marks in a blatant attempt to deceive United States consumers into believing that its soda products are the U.S. versions of the THUMS UP and LIMCA products sold by [Petitioner] in India."[5]

Respondent's Answer denied the salient allegations in the petition, and asserted a sizable list of "Affirmative Defenses," many of which are not true affirmative defenses.[6] Regardless, with the exception of laches, Respondent did not pursue the purported affirmative defenses at trial, and we therefore consider them waived.[7] *See Alcatraz Media, Inc. v. Chesapeake Marine Tours Inc.*, 107 USPQ2d 1750, 1753 n.6 (TTAB 2013), *aff'd*, 565 F. App'x 900 (Fed. Cir. 2014) (mem.).

---

[5] 101 TTABVUE 9 (Petitioner's Brief).

[6] 16 TTABVUE (Answer); Respondent filed a nearly identical answer in Cancellation No. 92064398, 7 TTABVUE (Answer).

[7] Respondent makes a passing reference to the abandonment, by Petitioner's predecessor-in-interest, of an application to register one of the marks at issue in the United States, which Respondent contends "show[s] that, to the extent Petitioner had any rights in its marks in the United States, those rights were abandoned." 110 TTABVUE 21 (Respondent's Brief). This reference was made only in the context of Respondent's argument that it has "Priority in the United States," *id.*, and, as we discuss later in this decision, the misrepresentation of source claim does not involve priority in the United States. *Cf., e.g., Midwest Plastic Fabricators Inc. v. Underwriters Labs. Inc.*, 5 USPQ2d 1067, 1069 (TTAB 1987) ("[T]he allegations ... are either unclear, non-specific, irrelevant to a pleading of unclean hands, or merely conclusory in nature."). Regardless, "a trademark owner does not abandon her rights in a mark by abandoning prosecution." *Australian Therapeutic Supplies Pty. Ltd. v. Naked TM, LLC*, 965 F.3d 1370, 2020 USPQ2d 10837, at **5 (Fed. Cir. 2020) (citations omitted).

## II. Laches

As to the laches defense,[8] Respondent contends that:

> Petitioner filed the present opposition [sic – cancellation] on March 8, 2016, three and one-half years after the date of registration. Although this delay is not extreme, time periods of similar and/or shorter periods have supported a laches defense.

Respondent points out that after its two subject registrations issued in November 2013, Petitioner pursued oppositions against three applications for THUMS UP-variant marks filed by Respondent. In its brief, Respondent contends that Petitioner's challenge to those three other applications in late 2013, but not to the two registrations in this case at that time, led Respondent "to believe that Petitioner was only concerned with the logos," and "caused prejudice to [Respondent] resulting from [its] further investment in and development of the marks, and the continued commercial use and economic promotion of its marks."[9] However, Respondent's Brief cites no evidence in support of the asserted prejudice, or to demonstrate that

---

[8] Both parties briefed the laches defense on the merits, and Petitioner has not questioned its availability against a claim of misrepresentation of source. Because it is an equitable defense, even if laches is established it must be weighed against the public interest. *See generally Loglan Inst., Inc. v. Logical Language Grp., Inc.*, 962 F.2d 1038, 22 USPQ2d 1531, 1534 (Fed. Cir. 1992) ("public interest in a cancellation proceeding to rid the register of a generic mark transcends" laches); *Swank, Inc. v. Ravel Perfume Corp.*, 438 F.2d 622, 168 USPQ 723, 725 (CCPA 1971) ("Where the competing marks are identical or are closely similar, the equitable principles defined by section 19 have been held not to be applicable inasmuch as the public interest is the dominant consideration.") (citations omitted). We need not and do not address that issue because, as discussed below, Respondent has not made the necessary showing to prevail on its laches defense in any event.

[9] 110 TTABVUE 43 (Respondent's Brief).

Respondent even relied on Petitioner's earlier inaction when Respondent continued its "investment" and "development" of the marks after 2013.

Respondent has not met its burden of proof to establish facts constituting laches. *See, e.g.*, *Bridgestone/Firestone Rsch., Inc. v. Auto. Club De L'Quest De La France*, 245 F.3d 1359, 58 USPQ2d 1460, 1462 (Fed. Cir. 2001) ("Bridgestone, as the party raising the affirmative defense of laches, bears the burden of proof. … To prevail on its affirmative defense, Bridgestone was required to establish that there was undue or unreasonable delay by the Automobile Club in asserting its rights, and prejudice to Bridgestone resulting from the delay.") (citations omitted); *Ava Ruha Corp. v. Mother's Nutritional Ctr.*, 113 USPQ2d 1575, 1580 (TTAB 2015) ("The party raising the affirmative defense of laches has the burden of proof"). For the laches defense, Respondent must show that Petitioner delayed unreasonably in asserting its rights, resulting in prejudice to Respondent from the delay. *Ava Ruha Corp.*, 113 USPQ2d at 1580.

The parties agree that in this case the period of delay at issue is three-and-a-half years.[10] *See Nat'l Cable Television Assoc., Inc. v. Am. Cinema Eds., Inc.*, 937 F.2d 1572, 19 USPQ2d 1424, 1431-32 (Fed. Cir. 1991) ("Logically, laches begins to run from the time action could be taken against the acquisition by another of a set of rights to which objection is later made."). The Board in *Ava Ruha* addressed a similar time period of three years and two months, holding that "[a]lthough this delay is not extreme, time periods shorter than, or only slightly longer than this, have supported

---

[10] 113 TTABVUE 16-17 (Petitioner's Reply Brief).

a laches defense." 113 USPQ2d at 1581 (citing *Teledyne Techs., Inc. v. W. Skyways, Inc.*, 78 USPQ2d 1203, 1211 (TTAB) (three years, eight months of unexplained delay held sufficient for laches), *aff'd*, 208 F. App'x 886 (Fed. Cir. 2006) and *Trans Union Corp. v. Trans Leasing Int'l, Inc.*, 200 USPQ 748, 756 (TTAB 1978) (finding laches based on a two-and-a-half-year period of delay)).

Petitioner insists that the delay was neither unreasonable nor prejudicial. Petitioner offers no explanation for its delay, however, and merely asserts that a delay of this length "without more, is not unreasonable,"[11] but even assuming an unreasonable delay, Respondent has not established prejudice resulting from the delay.

Respondent points to no evidentiary support for its alleged prejudice. *See Cai v. Diamond Hong, Inc.*, 901 F.3d 1367, 127 USPQ2d 1797, 1799 (Fed. Cir. 2018) ("Attorney argument is no substitute for evidence.") (quoting *Enzo Biochem, Inc. v. Gen-Probe Inc.*, 424 F.3d 1276, 1284 (Fed. Cir. 2005)); *In re Simulations Pubs., Inc.*, 521 F.2d 797, 187 USPQ 147, 148 (CCPA 1975) ("Statements in a brief cannot take the place of evidence."). The mere assertion that Respondent continued its use of the marks, even if true, does not suffice to show prejudice. *Schiedmayer Celesta GmbH v. Piano Factory Grp., Inc.*, 2019 USPQ2d 341894, *11-12 (TTAB 2019) (rejecting laches defense despite 7.5 years of delay where "[t]he entirety of [Respondent's] argument that they have suffered material prejudice is 'the Respondent sold and rented SCHIEDMAYER branded pianos continuously for seven years,'" finding that

---

[11] 113 TTABVUE 17 Petitioner's Reply Brief).

"Respondents have not shown any meaningful economic or other damage resulting from Petitioner's delay…."), *appeal docketed*, No. 20-1196 (Fed. Cir. Dec. 3, 2019); *Hornby v. TJX Cos.*, 87 USPQ2d 1411, 1419 (TTAB 2008) (unsupported claim that during the five-year period of delay respondent invested in and built up goodwill in its mark was not sufficient to support a laches defense).

Accordingly, assuming, without deciding, that a laches defense is available against the misrepresentation of source claim, because Respondent failed to prove that it suffered prejudice as a result of Petitioner's delay, the defense of laches fails.

## III.    Evidence and Objections

Both parties submitted testimony, as well as documents offered under notices of reliance. Petitioner also submitted multimedia evidence under notice of reliance.[12]

Respondent makes numerous evidentiary objections. Trademark Rule 2.128(b), 37 C.F.R. § 2.128(b), sets forth the procedure for evidentiary objections, which "may properly be raised in a party's brief on the case [or] may instead be raised in an appendix or by way of a separate statement of objections." Respondent included some of its objections in its Brief and some in an appendix thereto.[13] However, the appendix also incorrectly captioned and presented the objections as a motion to strike the evidence. As a result, Petitioner responded to the objections in an opposition to the

---

[12] Petitioner submitted some video clips filed on CD at 85 TTABVUE, Exhibits J and L to the Affidavit of Shrenik Dasani, and we refer to them using the TTABVUE docket number, Petitioner's Bates Number designation, and, where appropriate, by the point in time in the video clip.

[13] 110 TTABVUE (Defendant's Brief).

motion to strike.[14] Nonetheless, we consider Petitioner's opposition to be an acceptable "separate statement" accompanying its Reply Brief, which is allowed under the Trademark Rules of Practice.

After the parties concluded their briefing on the merits of the case, the case was submitted for final decision. Thereafter Respondent submitted an additional filing captioned "Registrant's Reply Brief in Support of Registrant's Objections to Petitioner's Trial Evidence and Motion to Strike Same."[15] Trademark Rule 2.128(a), 37 C.F.R. § 2.128(a), sets forth the procedure and schedule for briefing at final hearing, and in a case such as this with no counterclaim, does not permit a reply brief by the party in the position of defendant. *Id.* Thus, the rules do not provide for Respondent's Reply Brief regarding its evidentiary objections. TRADEMARK TRIAL AND APPEAL BOARD MANUAL OF PROCEDURE (TBMP) § 801.02(d) (2021). Given the specific rule regarding evidentiary objections in conjunction with briefing on the merits, we decline to accept Respondent's characterization of its evidentiary objections as a motion. To do so would complicate matters by introducing a potentially different schedule for motion briefing following the completion of merits briefing and the submission of the case for final decision, and would improperly allow the moving party to file a reply brief.

Accordingly, Respondent's Reply Brief at 116 TTABVUE is stricken and we have not considered it. *See Cai v. Diamond Hong*, 127 USPQ2d at 1799 (Federal Circuit

---

[14] 114 TTABVUE.

[15] 116 TTABVUE.

found that the Board did not abuse its discretion in applying the plain language of the TBMP and excluding defendant's reply brief).

Turning to the objections, Respondent first reasserts a prior timeliness objection to a portion of Petitioner's Exhibit 12 of its Notice of Reliance. The Board already addressed this issue, reopening Petitioner's testimony period to consider the pages of Exhibit 12 timely filed, and denying Respondent's motion to strike these four pages.[16] We decline to reconsider this ruling.

Next, Respondent objects to Petitioner's so-called "second Exhibit 13" of its Revised Notice of Reliance,[17] which Petitioner describes as follows:

> Printouts from the publicly available websites https://portexaminer.com/ and <https://www.eximpulse .com/> showing several recorded instances of third-party imports of [Petitioner's] THUMS UP-branded and LIMCA-branded beverage products from countries outside of the U.S. for subsequent resale in the U.S from the years 2012 (for THUMS UP)/2013 (for LIMCA) through 2018. These printouts show records of bills of lading from imports of THUMS UP and LIMCA branded products, obtained by searching <https://portexaminer.com/> and <https://www. eximpulse.com/> for records with the keywords "Thums Up" and "Limca." The printouts attached are in two formats: printouts using the Nimbus extension which more accurately captures the look of the screen when printed, and printouts created by printing to PDF directly from the relevant websites. These printouts demonstrate that Registrant's Affirmative Defense of abandonment is invalid.[18]

---

[16] 92 TTABVUE 4-5 (May 26, 2020 Board order).

[17] 78 TTABVUE 69-593.

[18] 75 TTABVUE 12-13 (Petitioner's Revised Notice of Reliance).

Respondent objects on several grounds to the "second Exhibit 13," arguing as a threshold matter that it falls outside the leave to cure the Board allowed in connection with a previously-granted motion to strike Petitioner's "first Exhibit 13." The "first Exhibit 13" documented third-party imports of Petitioner's goods into the United States. The Board granted Respondent's motion to strike this exhibit because it came from a fee-based, subscriber-only website (ImportScan) and therefore was not eligible for introduction under a notice of reliance.[19] *See Weyerhaeuser Co. v. Katz*, 24 USPQ2d 1230, 1232 (TTAB 1992) (fee-based private search reports do not qualify as printed publications or official records admissible under notice of reliance). The Board's order stated that "[t]o the extent Petitioner can cure its defect in Exh. 13, Petitioner is permitted fifteen days from the date of this order to provide the materials provided in Exh. 13 that comply with Board rules and specifically, are available to the public."[20] Petitioner's "second Exhibit 13" offers what Petitioner characterizes as "the same kind of information"[21] – online documents regarding third-party imports of Petitioner's goods into the United States – but they do not appear to involve the identical set of importation transactions. We sustain this objection to Petitioner's "second Exhibit 13," as it consists of different materials and information from that in the "first Exhibit 13," and therefore is outside the scope of what Petitioner was permitted to submit to cure the defect in the original.[22]

---

[19] 74 TTABVUE 10-12.

[20] 74 TTABVUE 14.

[21] 89 TTABVUE 6.

[22] Even if Exhibit 13 fell within the scope of the prior order's permission to cure the evidentiary defect, without accompanying testimony, we find that Exhibit 13 could not be

Finally, Petitioner's Revised Notice of Reliance stated that Exhibit 13 was relevant to "demonstrate that Registrant's Affirmative Defense of abandonment is invalid."[23] This affirmative defense has been waived.

Respondent next objects to Petitioner's documents, described as advertising or promotional materials, at 76 TTABVUE 20-32 and 75-350. However, the objections are not to the admissibility of the evidence, but instead relate to the probative value of the materials (e.g., "[n]one of the documents are accompanied by any evidence of viewership," and they "do not support Petitioner's claim of priority").[24] We overrule these objections, because the Board is capable of assessing the proper evidentiary weight to be accorded the evidence, taking into account the concerns raised by the objections. *See Pierce-Arrow Soc'y v. Spintek Filtration, Inc.*, 2019 USPQ2d 471774, at \*8-9 (TTAB 2019); *Luxco, Inc. v. Consejo Regulador del Tequila, A.C.*, 121 USPQ2d 1477, 1479 (TTAB 2017); *Poly-Am., L.P. v. Ill. Tool Works Inc.*, 124 USPQ2d 1508, 1510 (TTAB 2017), *aff'd*, No. 3:18-cv-00443-C (N.D. Tex. Oct. 29, 2019), *appeal dismissed*, No. 19-11180 (5th Cir. Feb. 4, 2020). Respondent also argues that exhibits

---

relied upon to establish the truth of the matters therein – i.e., that the documented transactions occurred as reflected in the documents. *See WeaponX Performance Prods. Ltd. v. Weapon X Motorsports, Inc.*, 126 USPQ2d 1034, 1038 (TTAB 2018) ("Although admissible for what they show on their face, see Trademark Rule 2.122(e)(2), 37 C.F.R. § 2.122(e)(2), this evidence also constitutes hearsay and may not be relied upon for the truth of the matters asserted therein."). Petitioner failed to lay the requisite foundation to support the conditions of the business records exception under Federal Rule of Evidence 803(6), so it does not apply.

[23] 75 TTABVUE 13.

[24] 111 TTABVUE 23 (Respondent's Brief).

to declaration testimony are subject to "the *Safer* Rule,"[25] but that rule applies only to self-authentication of Internet evidence, not to exhibits introduced through testimony.

Respondent objects to Petitioner's Notice of Reliance Exhibit 12 (the same portion referred to above at 78 TTABVUE 56-59), as well as Exhibit 14 (76 TTABVUE 325-333) and Exhibit 15 (79 TTABVUE 3-20), all of which are Internet Archive Wayback Machine screen captures, on numerous grounds. Respondent asserts that they cannot be relied on to prove the truth of any matter asserted in them, that some of the captures are "suspect" because the retail website appears the same despite the passage of years between screen captures, that there is no proof that any THUMS UP and LIMCA products shown are Petitioner's, that some of the capture dates are subsequent to Respondent's use and registration dates, and that the screen captures do not show retail sale in the United States.

We overrule the objections and admit the evidence, because in Board proceedings, Wayback Machine archival captures, like other Internet webpages displaying a URL and date, generally are admissible under a notice of reliance as self-authenticating materials. *See* Trademark Rule 2.122(e)(2), 37 C.F.R. § 2.122(e)(2) (internet materials are admissible under notice of reliance like printed publications in general circulation "so long as the date the internet materials were accessed and their source (e.g., URL) are provided"); *Safer*, 94 USPQ2d 1031. Offered solely under a notice of reliance,

---

[25] This rule, set forth in *Safer, Inc. v. OMS Invs., Inc.*, 94 USPQ2d 1031 (TTAB 2010), was codified in Trademark Rule 2.122(e), 37 C.F.R. § 2.122(e). *See In re I-Coat Co.*, 126 USPQ2d 1730, 1733 n.13 (TTAB 2018).

however, without accompanying testimony, such Wayback Machine evidence generally is admissible only for what it shows on its face. *WeaponX*, 126 USPQ2d at 1040-41 (webpages submitted under notice of reliance generally cannot be used to demonstrate priority without corroborating testimony); *cf. Spiritline Cruises LLC v. Tour Mgt. Servs., Inc.*, 2020 USPQ2d 48324, at *4 & n.33 (TTAB 2020) (because it was authenticated by an Internet Archive employee, who explained how the Wayback Machine works, Wayback Machine evidence admissible to establish "how the webpages appeared on particular dates"). The screenshots show the appearance of the Wayback Machine webpages in question as of the date of their capture by Petitioner. Respondent's remaining objections to these exhibits go to the probative value of the evidence, so we admit the evidence but consider the points made in the objections when weighing the evidence. *See Luxco*, 121 USPQ2d at 1479 (considering all evidence and testimony, noting that "the Board is capable of weighing the relevance and strength or weakness of the objected-to testimony and evidence, including any inherent limitations").

Respondent's objection to Exhibit 16, screenshots of a website and Instagram page, similarly is overruled, because the evidence is admissible, and the objection goes to the purpose for which the evidence can be considered and how much weight it should receive. *See id.*

Accordingly, with the exception of Petitioner's Exhibit 13 (78 TTABVUE 69-593; 83 TTABVUE 78-602), the record includes all the testimony and documents

introduced in Petitioner's Revised Notice of Reliance (PNOR) and in Defendant's eight Notices of Reliance (RNOR), as follows:

**Petitioner's Evidence**

- PNOR Exhibit 1-2 – Respondent's answers to interrogatories;[26]

- Discovery deposition of Kaushik Gandhi, Respondent's co-founder and Vice President, with exhibits (PNOR Exhibit 3);[27]

- Discovery deposition of Malathi Sundarraj, Respondent's corporate designee and legal assistant, with exhibits (PNOR Exhibit 4);[28]

- Discovery deposition of Meenaxi Gandhi, Respondent's President (PNOR Exhibit 5);[29]

- PNOR Exhibit 6 – Correspondence between Respondent and U.S. Customs and Border Protection regarding THUMS UP and LIMCA products;[30]

- Affidavit of Shrenik Dasani, Petitioner's Vice President, Sparkling Category, for Coca-Cola India and South-West Asia, with exhibits (PNOR Exhibit 7);[31]

- Affidavit of Michael Pittman, Petitioner's Marketing Director, Sparkling Brands Platform Innovation, with exhibits (PNOR Exhibit 8);[32]

---

[26] 75 TTABVUE 16-76; 80 TTABVUE 16-77 (confidential version).

[27] 75 TTABVUE 77-240; 80 TTABVUE 78-240 (confidential version).

[28] 75 TTABVUE 241-429; 80 TTABVUE 241-429 (confidential version).

[29] 75 TTABVUE 430-65; 80 TTABVUE 430-65 (confidential version).

[30] 75 TTABVUE 466-87; 80 TTABVUE 466-87 (confidential version).

[31] 75 TTABVUE 488-740 & 76 TTABVUE 1-248; 80 TTABVUE & 81 TTABVUE (confidential version).

[32] 76 TTABVUE 249-371; 81 TTABVUE (confidential version).

- PNOR Exhibit 9 – Records of TTAB and district court trademark proceedings involving Respondent and third parties;[33]

- PNOR Exhibit 10 – TSDR records of Respondent's applications and registrations for various marks;[34]

- PNOR Exhibit 11 – TSDR records of Respondent's prior applications for THUMS UP marks;[35]

- PNOR Exhibit 12 – Internet Archive WayBack Machine screenshots of the website of Salwan Group of Companies, d/b/a Salwan Trading, Inc.;[36]

- PNOR Exhibit 14 -- Internet Archive WayBack Machine screenshots of the website of P.J. Export;[37]

- PNOR Exhibit 15 – current screenshots and Internet Archive WayBack Machine screenshots of the website of Cherians International Fresh Market, LLC;[38] and

- PNOR Exhibit 16 – Screenshots of the website and Instagram page of Botiwalla Alpharetta, LLC.[39]

**Respondent's Evidence**

---

[33] 76 TTABVUE 372-583; 81 TTABVUE (confidential version).

[34] 77 TTABVUE 1-356; 82 TTABVUE (confidential version).

[35] 77 TTABVUE 357-558 & 78 TTABVUE 1-54; 82 TTABVUE 357-558 & 83 TTABVUE 1-54 (confidential version).

[36] 78 TTABVUE 54-68; 83 TTABVUE 54-68 (confidential version).

[37] 79 TTABVUE 1-20; 84 TTABVUE 1-20 (confidential version).

[38] 79 TTABVUE 21-25; 84 TTABVUE 21-25 (confidential version).

[39] 79 TTABVUE 26-36; 84 TTABVUE 26-36 (confidential version).

- First RNOR – Excerpts from Petitioner's Annual Reports, 2006-2016;[40]

- Second RNOR -- Excerpts from Petitioner's Annual Reports, 2006-2016;[41]

- Third RNOR – Petitioner's answers to interrogatories;[42]

- Fourth RNOR – TESS and TSDR records for LIMCA and THUMS UP marks; and Canadian Intellectual Property Office records of a decision in an expungement proceeding involving the parties in this case regarding the mark THUMS UP;[43]

- Fifth RNOR – An article from The Economic Times titled "Coca-Cola to take Thums Up globally; sees India among top 5 market";[44]

- Sixth RNOR -- Petitioner's answers to interrogatories;[45]

- Seventh RNOR -- Petitioner's answers to interrogatories;[46] and

- Eighth RNOR – Internet screenshots of websites promoting sodas/soft drinks.[47]

## IV.    Statutory Entitlement to Petition to Cancel

Entitlement to a statutory cause of action must be established in every inter partes case. *Australian Therapeutic Supplies Pty. Ltd. v. Naked TM, LLC*, 965 F.3d

---

[40] 93 TTABVUE.

[41] 94 TTABVUE.

[42] 95 TTABVUE; 96 TTABVUE (confidential version).

[43] 97 TTABVUE 1-24.

[44] 97 TTABVUE 25-27.

[45] 98 TTABVUE.

[46] 99 TTABVUE.

[47] 100 TTABVUE.

1370, 2020 USPQ2d 10837, at *3 (Fed. Cir. 2020) (citing *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 125-26, 109 USPQ2d 2061, 2067 n.4 (2014)). A party in the position of plaintiff may petition to cancel a registration when the cause of action is within the zone of interests protected by the statute, 15 U.S.C. § 1064, and the plaintiff has a reasonable belief in damage that is proximately caused by the continued registration of the mark. *Corcamore, LLC v. SFM, LLC*, 978 F.3d 1298, 2020 USPQ2d 11277, at *6-7 (Fed. Cir. 2020), *cert. denied*, ___ U.S. ___ (2021).

"Proof of [entitlement to a statutory cause of action] in a Board [cancellation] is a low threshold, intended only to ensure that the plaintiff has a real interest in the matter, and is not a mere intermeddler." *Syngenta Crop Prot. Inc. v. Bio-Chek LLC*, 90 USPQ2d 1112, 1117 n.8 (TTAB 2009) (citing *Ritchie v. Simpson*, 170 F.3d 1092, 50 USPQ2d 1023, 1025-26 (Fed. Cir. 1999)). Demonstrating a real interest in cancelling the registration of a mark satisfies the zone-of-interests requirement, and demonstrating a reasonable belief in damage by the registration of a mark suffices to show damage proximately caused by such registration. *Corcamore, LLC*, 2020 USPQ2d 11277, at *7-8. "In most settings, a direct commercial interest satisfies the 'real interest' test." *Herbko Int'l v. Kappa Books*, 308 F.3d 1156, 64 USPQ2d 1375, 1377 (Fed. Cir. 2002).

In this case, as discussed in more detail below, Petitioner has established that it owns registrations in India and multiple other countries for the marks THUMS UP

and LIMCA for the same types of goods at issue here.[48] Petitioner also has shown that under those marks, Petitioner commands a substantial market share for such goods in India.[49] These marks have been deemed well known in India.[50] Petitioner also sells and promotes THUMS UP and LIMCA sodas outside of India, in numerous other countries.[51] The evidentiary record, discussed in more detail below, also shows that the reputation of Petitioner's THUMS UP and LIMCA beverages would extend to the United States, at least among the significant population of Indian-American consumers. Petitioner introduced evidence that THUMS UP and LIMCA beverages produced or sold by Petitioner abroad are imported and sold in the United States by others.[52] In addition, the record includes testimony regarding Petitioner's plans to market its THUMS UP and LIMCA beverages more widely in the United States.[53]

The Board addressed a factual scenario similar to the one in this case, and found the requisite statutory entitlement to a cause of action in *Bayer Consumer Care AG v. Belmora LLC*, 110 USPQ2d 1623, 1631 (TTAB 2014), *aff'd*, 338 F. Supp. 3d 477 (E.D. Va. 2018), *aff'd in relevant part, vacated and remanded on other grounds*, 987 F.3d 284, 2021 USPQ2d 126 (4th Cir. 2021). The Board explained:

---

[48] 75 TTABVUE 496, 507-70 (Dasani Affidavit) (THUMS UP); 75 TTABVUE 497, 612-86 (Dasani Affidavit) (LIMCA).

[49] 75 TTABVUE 490-95 (Dasani Affidavit); 76 TTABVUE 252 (Pittman Affidavit).

[50] *E.g.*, 75 TTABVUE 573, 692-93 (Indian judicial opinions declaring the marks well known).

[51] *E.g.*, 75 TTABVUE 493, 496-97 (Dasani Affidavit); 76 TTABVUE 252-53 (Pittman Affidavit).

[52] *E.g.*, 75 TTABVUE 501-02 (Dasani Affidavit); 76 TTABVUE 206-09, 238, 253-57 (Pittman Affidavit); 79 TTABVUE; 81 TTABVUE 229-50 (confidential).

[53] 76 TTABVUE 256.

> Petitioner has established that it owns a registration for the mark FLANAX for pain relievers in Mexico and licenses its corporate affiliate to sell pain relievers containing the active ingredient naproxen sodium under that mark in Mexico. The registration petitioner seeks to cancel is for the identical mark for identical goods, namely, "Orally ingestible tablets of Naproxen Sodium for use as an analgesic." Thus, in terms of standing, petitioner has shown that it has an interest in protecting its Mexican FLANAX mark. If respondent is using the FLANAX mark in the United States to misrepresent to U.S. consumers the source of respondent's products as petitioner's Mexican products, it is petitioner who loses the ability to control its reputation and thus suffers damage. . . . [T]he record in this case clearly establishes that the reputation of the Mexican FLANAX mark does not stop at the Mexican border.

*Id.* at 1632 (citing *Steele v. Bulova Watch Co.*, 344 U.S. 280, 95 USPQ 391, 394 (1952) (stating that infringing goods bearing the BULOVA mark made in Mexico "could well reflect adversely on Bulova Watch Company's trade reputation in markets cultivated by advertising here as well as abroad")).

Just as in *Belmora*, if Respondent in this case uses the THUMS UP and LIMCA marks "to misrepresent to U.S. consumers the source of [R]espondent's products as [P]etitioner's [Indian] products, it is [P]etitioner who loses the ability to control its reputation and thus suffers damage." *Id.* at 1632. Petitioner thus has a direct commercial interest at stake. *See Tanners' Council of Am., Inc. v. Gary Indus., Inc.*, 440 F.2d 1404, 169 USPQ 608, 609 (CCPA 1971) ("It seems clear enough that registration of the mark as applied for could weaken the sales positions of appellants' members and hence reduce the income of appellant.").

Unlike in *Belmora*, however, where the petitioner acknowledged that it did not use its FLANAX mark at all in the United States, Petitioner in this case offers

evidence that its products are sold by third-party importers in the United States.[54] Mr. Dasani, Petitioner's Vice President, Sparkling Category, for Coca-Cola India and South-West Asia, testified that "THUMS UP-branded and LIMCA-branded products are resold in Indian grocery stores around the world, including in the U.S.,"[55] and provided documents relating to sales by one of its authorized bottlers of THUMS UP and LIMCA beverages to an Indian distributor, and the products eventually were exported to the United States.[56] Petitioner's THUMS UP cola also is imported into the United States to serve to consumers at Petitioner's World of Coca-Cola locations in Atlanta, Georgia and Orlando, Florida, as reflected in testimony and business records, corroborated by online articles reporting on consumers who tried the beverages offered at the venues.[57] Mr. Pittman, Petitioner's Marketing Director, Sparkling Brands Platform Innovation, testified to the third-party importation of Petitioner's "authentic Thums Up and Limca beverage products from countries outside of the U.S. for subsequent resale in the U.S. These authentic products are sold at various points of sale through the U.S., including specialty stores that cater to Indian and Southeast Asian consumers, such as Illinois-based Salwan Trading, Inc.," for which he provided corroborating documentation.[58] Mr. Pittman also gave

---

[54] 76 TTABVUE 257 (Pittman Affidavit) (overlap "includ[es] Indian grocery stores and restaurants").

[55] 75 TTABVUE 501 (Dasani Affidavit).

[56] 75 TTABVUE 501 (Dasani Affidavit); 81 TTABVUE 229-50 (confidential).

[57] 75 TTABVUE 501-02 (Dasani Affidavit); 76 TTABVUE 206-09, 238; 76 TTABVUE 255 (Pittman Affidavit); 76 TTABVUE 342, 349-50.

[58] 76 TTABVUE 254, 325-33 (Pittman Affidavit). We consider the screen captures from the Salwan Group of Companies website he provided as corroboration of Mr. Pittman's testimony

examples of three retail establishments in Atlanta, Georgia that offer for sale Petitioner's Thums Up and Limca beverages, as well as stating that these products are available on Amazon through third-party sellers.[59]

As an additional means of demonstrating its direct commercial interest in Petitioner's claim, Mr. Pittman testified about Petitioner's awareness of market trends involving the popularity of ethnic foods among all types of consumers, as well as the interest of Indian-American consumers in obtaining products from India through Indian grocers in the United States.[60] To give a sense of the market size, Mr. Pittman pointed to 2010 Census data, to the substantial "Asian Indian population in the United States [which] grew from approximately 1.6 million in 2000 to over 2.6 million in 2010, a nearly 60% increase, and is currently one of the fastest growing ethnic groups in the United States."[61] Mr. Pittman cited to Pew Research Center data suggesting that this population had grown to over 3.8 million in 2015.[62] Mr. Pittman testified to Petitioner's "plans to sell authentic Thums Up and Limca products [in the

---

that Salwan Trading, Inc. caters to Indian and Southeast Asian consumers, and features Petitioner's THUMS UP and LIMCA products.

[59] 76 TTABVUE 254-55 (Pittman Affidavit). The record includes screen captures of sites associated with U.S. retail establishments promoting THUMS UP and LIMCA beverages, shown with logos matching Petitioner's, and in one case on a page with other Coca-Cola products. 79 TTABVUE. Petitioner did not provide any corroborating documentary evidence regarding availability on Amazon, and because of its international nature, we therefore give the very general testimony about availability on Amazon limited weight.

[60] 76 TTABVUE 256-57 (Pittman Affidavit).

[61] 76 TTABVUE 256 (Pittman Affidavit).

[62] 76 TTABVUE 256 (Pittman Affidavit).

United States] through e-commerce websites as well as through its customers and on-premise food service partners."[63]

Mr. Pittman described the harm that Respondent's use of the THUMS UP and LIMCA marks cause as stemming from the upset expectations of consumers who are familiar with Petitioner's goods when the consumers encounter Respondent's goods under the same marks. He also pointed to Respondent's actions to block the importation into the United States by third-party authorized importers and resellers of Petitioner's goods under the marks.[64]

We accordingly find that Petitioner is not a mere intermeddler, but instead has a misrepresentation of source claim within the zone of interests protected by the statute, and reasonably believes in damage proximately caused by the continued registration by Respondent of THUMS UP and LIMCA. *See Corcamore*, 2020 USPQ2d 11277, at *6-7; *Belmora*, 110 USPQ2d at 1631-32.

## V.   Misrepresentation of Source

Under Trademark Act Section 14(3), a registration is subject to cancellation if the mark "is being used by, or with the permission of, the registrant so as to misrepresent the source of the goods or services on or in connection with which the mark is used." 15 U.S.C. § 1064(3). "Willful use of a confusingly similar mark is insufficient." *Belmora*, 110 USPQ2d at 1632 (citing *McDonnell Douglas Corp. v. Nat'l Data Corp.*, 228 USPQ 45, 47 (TTAB 1985)). Rather, the misrepresentation of source must involve

---

[63] 76 TTABVUE 258 (Pittman Affidavit).

[64] 76 TTABVUE 257-59 (Pittman Affidavit); 75 TTABVUE 466-87; 80 TTABVUE 488-87 (confidential).

a respondent deliberately passing off its goods as those of another. The claim "refers to situations where it is deliberately misrepresented by or with the consent of the respondent that goods and/or services originate from a manufacturer or other entity when in fact those goods and/or services originate from another party." *Belmora*, 110 USPQ2d at 1632 (quoting *Osterreichischer Molkerei-und Kasereiverband Registriete GmbH v. Marks & Spencer Ltd.*, 203 USPQ 793, 794 (TTAB 1979) and citing *Global Maschinen GmbH v. Global Banking Sys., Inc.*, 227 USPQ 862, 864 n.3 (TTAB 1985)). The respondent's use must be a "blatant misuse of the mark … in a manner calculated to trade on the goodwill and reputation of petitioner." *Otto Int'l Inc. v. Otto Kern GmbH*, 83 USPQ2d 1861, 1863 (TTAB 2007).

As discussed below, the evidence demonstrates such blatant misuse by Respondent, and paints the picture of Respondent's deliberate efforts to pass off its goods as those of Petitioner.

### A. Petitioner's THUMS UP Mark

In India, Petitioner's THUMS UP mark has been used since 1977 for a cola product, and is well known.[65] Mr. Dasani testified that in the 1980's, THUMS UP had over 80% of the cola market share in India.[66] At the time that Petitioner purchased the THUMS UP brand in India from Petitioner's predecessor-in-interest in 1993,[67] THUMS UP's market share had increased to 85%.[68] Mr. Pittman testified that

---

[65] 75 TTABVUE 490, 493, 496-97 (Dasani Affidavit).

[66] 75 TTABVUE 489 (Dasani Affidavit).

[67] 96 TTABVUE 8, 18 (confidential).

[68] 75 TTABVUE 490 (Dasani Affidavit).

"Thums Up is currently the top selling sparkling beverage in India and is one of the world's best-selling beverages. It currently is sold to over 2.4 million retailers globally. Thums Up is set to be [Petitioner's] next billion-dollar brand."[69] Global sales of Petitioner's THUMS UP "are expected to reach $1 billion within the next two years.[70]

Petitioner provided confidential sales figures for THUMS UP from 1994 to 2018, reflecting impressive numbers indicative of its status as well known in India.[71] Petitioner submitted confidential advertising expenses for 2005 to 2016, which reflect a substantial investment in promoting the beverage.[72] The record includes articles in publications such as *The Economic Times*, an Indian English-language daily newspaper, regarding Petitioner's endorsement deal with Bollywood actor Salman Khan for its THUMS UP cola in India, describing it as "among the highest endorsement deals signed by a leading actor or cricketer."[73]

The record includes an Indian judicial opinion from the High Court of Delhi at New Delhi, dated March 14, 2014, introduced through testimony from Petitioner's Vice President, calling THUMS UP a "well known trade mark."[74] The decision goes on to state that "THUMS UP ... possess[es] enormous reputation in India" and

---

[69] 76 TTABVUE 252 (Pittman Affidavit).

[70] 75 TTABVUE 493 (Dasani Affidavit).

[71] 75 TTABVUE 491-92 (Dasani Affidavit); 80 TTABVUE 491-92 (confidential version).

[72] 75 TTABVUE 499 (Dasani Affidavit).

[73] 76 TTABVUE 23.

[74] 75 TTABVUE 573 (Dasani Affidavit).

"enjoy[s] the highest and widest degree of statutory protection."[75] While Respondent correctly notes that this decision and its holding "are not binding" on the Board,[76] the decision nonetheless reflects a considered and evidence-based judicial determination that THUMS UP is well known in India. In 2013, *The Economic Times* published rankings of the "Most Trusted Brands 2013," listing THUMS UP as 13th.[77] Further, *The Economic Times* Brand Equity Most Exciting Brand Survey ranked THUMS UP fifth.[78]

Petitioner introduced 15 Indian trademark registrations it owns for the mark THUMS UP for a variety of goods including beverages and preparations for making beverages,[79] as well as registrations for the mark in Bahrain, Bangladesh, Bhutan, Jordan, Oman, Singapore, Sri Lanka, United Arab Emirates, and Zambia.[80]

When Petitioner acquired the THUMS UP mark from its predecessor-in-interest, the following logo was used: .[81] Petitioner currently uses this

---

[75] 75 TTABVUE 588.

[76] 110 TTABVUE 36 (Respondent's Brief).

[77] 75 TTABVUE 498 (Dasani Affidavit); 76 TTABVUE 139.

[78] 75 TTABVUE 498 (Dasani Affidavit); 76 TTABVUE 137; *see also* 81 TTABVUE 145-55 (confidential).

[79] 75 TTABVUE 496, 507-31 (Dasani Affidavit).

[80] 75 TTABVUE 496, 533-70 (Dasani Affidavit).

[81] 75 TTABVUE 491 (Dasani Affidavit).

modified version of the logo: .[82] For Petitioner's THUMS UP cola in India, "[o]ne of its most popular tag lines is 'Taste the Thunder,' which it has been using in conjunction with its marketing of Thums Up since at least as early as 1988."[83] The record includes examples of Petitioner's television commercials for THUMS UP, some dated as early as 2002, which feature the tag line, such as in the screenshots shown below:

[84]

---

[82] 75 TTABVUE 492 (Dasani Affidavit).

[83] 75 TTABVUE 493 (Dasani Affidavit).

[84] 85 TTABVUE TCCC000015, video clip dated 2003, at the 43-second mark.





---

85 85 TTABVUE TCCC000084, video clip dated 2009, at the 54-second mark.

86 85 TTABVUE TCCC000045, undated video clip, at the 29-second mark.





---

[87] 85 TTABVUE TCCC000024, undated video clip, at the 40-second mark.

[88] 85 TTABVUE TCCC000021, video clip dated 2005, at the 40-second mark.

Petitioner's Indian trademark registrations include one dated December 24, 2009 for the mark THUMS UP THUNDER WHEELS for various beverages.[89]

The record reflects that Petitioner's THUMS UP mark has achieved renown that extends beyond the borders of India. The reputation of Petitioner's THUMS UP likely would be familiar to much of the substantial Indian-American population in the United States, and the record reflects an interest in Petitioner's goods in the United States by Indian grocers, restaurants and other retail outlets.[90] All three of Respondent's witnesses acknowledged their familiarity with the brand from their time in India.[91]

### B. Petitioner's LIMCA Mark

The LIMCA brand of lemon-lime soft drink was introduced in India in 1971 by Petitioner's predecessor-in-interest, and Mr. Dasani testified that since that time it has been "India's No.1 Sparkling Drink in the Cloudy lemon Segment."[92] Among carbonated beverages in general in India, "Limca is one of the top best-selling."[93] Petitioner acquired the LIMCA brand from its predecessor-in-interest in 1993, and continued use of the same logo and trade dress that have been in use since LIMCA's 1971 launch:

---

[89] 75 TTABVUE 532.

[90] *E.g.,* 75 TTABVUE 501-02 (Dasani Affidavit); 76 TTABVUE 206-09, 238, 253-57 (Pittman Affidavit); 79 TTABVUE; 81 TTABVUE 229-50 (confidential).

[91] 75 TTABVUE 109 (Kaushik Gandhi); 75 TTABVUE 439 (Meenaxi Gandhi); 75 TTABVUE 280-81 (Malathi Sundarraj).

[92] 75 TTABVUE 494 (Dasani Affidavit); *see also* 76 TTABVUE 252.

[93] 75 TTABVUE 496 (Dasani Affidavit).




94

Petitioner provided confidential sales figures for the LIMCA brand from 2006 to 2018,[95] which are quite substantial, and confidential advertising expenses for 2012 to 2018,[96] reflecting a significant investment in promoting the brand. The advertising has included websites, social media, television commercials, and sponsorship since 1990 of "the Indian version of the Guinness Book of World Records," known as "the Limca Book of Records."[97] Petitioner submitted an Indian judicial opinion from the High Court of Delhi at New Delhi dated July 9, 2011, introduced through testimony from Petitioner's Vice President, holding that LIMCA and the LIMCA logo are "well known" marks.[98]

Petitioner introduced 14 Indian trademark registrations it owns for the mark LIMCA,[99] as well as registrations for the mark in Bahrain, Bangladesh, Bhutan, Fiji,

---

[94] 75 TTABVUE 494 (Dasani Affidavit).

[95] 75 TTABVUE 495 (Dasani Affidavit).

[96] 75 TTABVUE 500 (Dasani Affidavit).

[97] 75 TTABVUE 499 (Dasani Affidavit).

[98] 75 TTABVUE 692-93 (Dasani Affidavit).

[99] 75 TTABVUE 497, 612-33 (Dasani Affidavit).

Kuwait, Oman, Nepal, Nigeria, Qatar, Saudi Arabia, Sri Lanka, Tanzania, the United Arab Emirates, and Zambia.[100]

The record includes examples of Petitioner's television commercials for LIMCA that feature the logo, including one bearing a date in 2011, such as in the screenshots shown below:

[101]

---

[100] 75 TTABVUE 497, 634-86 (Dasani Affidavit).

[101] 85 TTABVUE TCCC0000528, undated video clip, at the 48-second mark.





The record reflects that Petitioner's LIMCA mark has achieved a reputation in India that would extend to the United States, in that it likely would be familiar to

---

[102] 85 TTABVUE TCCC0000512, undated video clip, at the 55-second mark.

[103] 85 TTABVUE TCCC0000513, undated video clip, at the 1:01-mark.

much of the substantial Indian-American population in the United States. The record also indicates an interest in Petitioner's goods in the United States by Indian grocers, restaurants and other retail outlets.[104] Two of Respondent's three witnesses acknowledged their familiarity with LIMCA from their time in India.[105]

### C. Respondent's Activities

Respondent, founded in 2003 by brothers Anil Gandhi and Kaushik Gandhi, who serve as Vice Presidents and run the business,[106] describes itself as a "purveyor of and distributor of food products" that are "manufactured in India and distributed primarily to Indian grocers in the United States."[107] Respondent advertises its products in a monthly magazine focused on the "Indian community."[108]

### 1. THUMS UP

Respondent adopted THUMS UP as a mark for its cola product, with the same misspelling of "thumbs" found in Petitioner's mark, so that both marks omit the "b" and present the word as THUMS. Respondent claims to have come up with the mark independently, based on the positive "thumbs up" gesture that family and friends made when taste-testing Respondent's cola.[109] However, the record also makes clear that before selecting THUMS UP, Respondent was familiar with Petitioner's (or its

---

[104] *E.g.,* 75 TTABVUE 501-02 (Dasani Affidavit); 76 TTABVUE 206-09, 238, 253-57 (Pittman Affidavit); 79 TTABVUE; 81 TTABVUE 229-50 (confidential).

[105] 75 TTABVUE 156, 164 (Kaushik Gandhi); 75 TTABVUE 452 (Meenaxi Gandhi).

[106] 98 TTABVUE 9.

[107] 110 TTABVUE 12 (Respondent's Brief); *see also* 75 TTABVUE 255-56 (Malathi Sundarraj testifying that Meenaxi distributes primarily to Indian grocers as its customers).

[108] 75 TTABVUE 40, 63, 97-98.

[109] 75 TTABVUE 19 (Respondent's Answer to Interrogatory No. 4).

predecessor-in-interest's) THUMS UP beverage through its reputation in India. For example, Kaushik Gandhi stated that when he lived in India, he tasted THUMS UP "[m]any years ago," "in [his] college days."[110] At that time in the 1980's, his college canteen sold THUMS UP.[111] Also, Meenaxi Gandhi, Respondent's President and namesake, testified that she moved from India to the United States in 1998 or 1999.[112] When she lived in India, she was aware of a drink called THUMS UP.[113] Malathi Sundarraj, Respondent's corporate designee and legal assistant, testified that she was aware of a THUMS UP drink in India in the 1990's during her childhood, when she remembers seeing it on lists of grocery items available at markets.[114] She also testified as follows:

> Q. When was Meenaxi [Respondent] first aware of a Thums Up soda sold in India?
>
> A. Meenaxi you mean -- sorry. Can you repeat it? Jeera masala Thums Up or Coca-Cola's Thums Up?
>
> Q. A Thums Up products [sic] sold in India?
>
> A. Thums Up soda. Meenaxi had knowledge like since my bosses [previously identified as Kaushik and Anil Gandhi] are from India, so they had knowledge when they were in India.[115]
>
> ***

---

[110] 75 TTABVUE 109.

[111] 75 TTABVUE 115.

[112] 75 TTABVUE 439.

[113] 75 TTABVUE 450-51.

[114] 75 TTABVUE 280-81.

[115] 75 TTABVUE 282.

Kaushik knew about Thums Up drink sold in India in at least the 1980's. Is that correct?

A. Yes.

Q. That was prior to the formation Meenaxi Enterprise though?

A. Yes.[116]

***

Q. At the time Meenaxi Enterprise adopted its Thums Up mark for its jeera masala soda, at least Kaushik Gandhi was aware there was a Thums Up drink in India. Is that correct?

A. Yes.[117]

In his testimony, Kaushik Gandhi testified that although he tasted THUMS UP at his college canteen in India, he developed the THUMS UP mark independently, and omitted the "B" from "Thums" only because the "B" is silent in the English word.[118]

Q. Have you seen this image [drawing page from Respondent's Thums Up logo application in the USPTO] before is my question?

A. Not particularly the same image. Same to -- same image, but I mean I have seen images.

Q. Where have you seen it?

A. In India.

Q. In what regard did you see it?

A. With the Thums Up soda.

---

[116] 75 TTABVUE 285-86.

[117] 75 TTABVUE 290.

[118] 75 TTABVUE 163.

Q. Is this an image of a design for the Thums Up soda at least sold in India? Is that how you saw it?

A. Yes.[119]

In answering an interrogatory, Respondent described its awareness as follows:

> Registrant has no "knowledge or awareness" as to THUMS UP purportedly used or owned by Coca-Cola in the US. Registrant's [sic] is aware that THUMS UP was used in India by an Indian company, not Coca-Cola, around the 1970's for soda. Upon information and belief, Registrant was aware that popularity and demand in India for the brand went down after about 15-20 years. Upon information and belief, Registrant was aware that Coca-Cola entered the Indian soda market and purchased THUMS UP sometime in the early 1990's for the sole purpose of abandoning the mark and removing it as a competitor for the Coca-Cola brand in India.[120]

Respondent claims that Kaushik Gandhi searched the USPTO database and "several U.S. Indian grocers," and only found a U.S. application for the mark owned by Petitioner's predecessor-in-interest that was abandoned in 1987.[121]

As noted above, a misrepresentation of source claim does not rest on mere willful use of a similar mark. In this case, Respondent's activity with the marks went beyond mere selection of familiar famous marks from India. Respondent developed logos that strongly resemble those used by Petitioner and its predecessor-in-interest in India. Respondent identified the following THUMS UP logos that it concedes were "copied, in whole or in part, from logos of others":

---

[119] 75 TTABVUE 298-301.

[120] 75 TTABVUE 21.

[121] 110 TTABVUE 14; 75 TTABVUE 299-300.

   

[122]

Respondent contends that this copying occurred as a result of graphic design work by a friend of Kaushik Gandhi, Raju Shah, who copied these and other brand's logos without Respondent's knowledge. Respondent deems this "a very unfortunate time in [its] corporate life."[123] According to Respondent, when it learned of the copying, Respondent discontinued use of these logos (but still continued use of the THUMS UP word mark).[124] Respondent claims to have cut ties with Mr. Shah "and has no knowledge of his whereabouts."[125] According to Respondent, "[p]roducts bearing the referenced Shah THUMS UP logos were distributed from September 2012 to February 2014 (i.e., one and one-half years). Only a negligible amount was distributed. Registrant's application for the logo mark was withdrawn because of opposition from Petitioner."[126]

Respondent's corporate designee, Malathi Sundarraj testified somewhat differently about Respondent's knowledge. After explaining that the THUMS UP logo

---

[122] 75 TTABVUE 43-44 (Respondent's answer to Interrogatory No. 11).

[123] 110 TTABVUE 19 (Respondent's Brief).

[124] 75 TTABVUE 43 (Respondent's answer to Interrogatory No. 11). Respondent adopted a new logo for its THUMS UP cola.

[125] 110 TTABVUE 20 (Respondent's Brief).

[126] 110 TTABVUE 20 (Respondent's Brief).

used by Respondent was designed by Mr. Shah, whom she described as a friend of Kaushik Gandhi, and acknowledging that it looked like the design used in India on THUMS UP, she stated that Respondent knew Petitioner's predecessor-in-interest had applied for and abandoned the design, leading Respondent to presume that it was available.[127] Regardless of whether Petitioner owned a registration for the logo in the United States that would block Respondent's applications,[128] we find that Respondent was aware of the resemblance of its logo to the one used by Petitioner on its foreign cola products. Respondent represents that the logo remained in use from September 2012 to February 2014.[129]

Respondent's adoption of logos essentially identical to both the older and updated versions of Petitioner's logo reflects an effort to dupe consumers in the United States who were familiar with Petitioner's THUMS UP cola from India into believing that Respondent's THUMS UP cola was the same drink. *See E.E. Dickinson Co. v. T.N. Dickinson Co.*, 221 USPQ 713, 715 (TTAB 1984) (properly pleaded claim of misrepresentation of source alleged that in addition to use of the same mark as plaintiff, registrant marketed its goods using trade dress similar to plaintiff's).

Notably, in addition to using the nearly identical THUMS UP logos that Respondent used, Respondent went further to pass off its cola as Petitioner's. Respondent also adopted the same tagline, "Taste the Thunder," that Petitioner and

---

[127] 75 TTABVUE 296-300 (Sundarraj deposition).

[128] Respondent applied to register in the United States a few versions of the logo.

[129] 110 TTABVUE 20; 75 TTABVUE 66-69.

its predecessor-in-interest used in India to market THUMS UP since 1988.[130] In fact, Respondent applied in the United States to register a THUMS UP-variant mark that also included the wording, "Taste the Thunder."[131] Kaushik Gandhi testified that he came up with "Taste the Thunder" independently and was not aware that Coca-Cola used "Taste the Thunder" with its THUMS UP mark,[132] an assertion that we do not find credible, just as we do not believe Ms. Sundarraj's similar testimony that use of the identical tagline was merely coincidental.[133] In fact, these implausible explanations of coincidence support instead of detract from a finding that Respondent intended to pass off its goods as Petitioner's. USPTO records reflect that when Respondent applied to register a composite mark that included the wording THUMS UP TASTE THE THUNDER, Petitioner opposed, and Respondent then withdrew the application without consent, resulting in judgment in Petitioner's favor.[134] Respondent's discontinuation of the copied logo and its abandonment of the tagline application do not undercut the misrepresentation of source claim. As in *Belmora*, "we do not view [R]espondent's continued use of the copied packaging as essential to [P]etitioner's misrepresentation claim" where "Respondent built its business on this heritage of misrepresentation, and [P]etitioner suffers damage today due to [R]espondent's continued use of the identical … mark on the same type of product,

---

[130] 75 TTABVUE 493 (Dasani Affidavit).

[131] 75 TTABVUE 161-62; 77 TTABVUE 495-501.

[132] 75 TTABVUE 162.

[133] 75 TTABVUE 310.

[134] 75 TTABVUE 230.

even though its packaging and marketing may have changed." *Belmora*, 110 USPQ2d at 1636.

### 2. LIMCA

Kaushik Gandhi acknowledged that before Respondent adopted LIMCA as a mark for its soda, he was aware of a LIMCA beverage from seeing it listed as available at his college canteen.[135] Later in the same deposition, he testified that he "tried the Limca product at [his] college's canteen."[136] Respondent's corporate designee also testified, after considerable hesitation, that Kaushik Gandhi was aware of a beverage in India called LIMCA prior to Respondent's adoption of LIMCA as a mark for its soda. After initially indicating that she was uncertain of his awareness, the questions and answers proceeded as follows:

> Q. Did you ask him about had [sic] knowledge of Limca in India in preparation for today's deposition.
>
> A. Yes.
>
> Q. What did he tell you about that?
>
> A. There was a product available, but personally like he never test tasted or anything. So that way like that's what he gave me the answer was [sic].
>
> Q. But he was aware at least there was a product in India sold under the name Limca?
>
> A. Sorry. Yes.[137]

---

[135] 75 TTABVUE 156 (Kaushik Gandhi Deposition).

[136] 75 TTABVUE 164 (Kaushik Gandhi Deposition).

[137] 75 TTABVUE 323 (Sundarraj Deposition).

She provided a rather elaborate explanation of how Respondent independently devised the word mark LIMCA, involving a combination of the words for ingredients "limbo," or lime, and "kala namak," or black salt.[138] Shortly thereafter, however, she again confirmed that:

> Q. And at that time was at least Mr. Kaushik Gandhi aware that there was a drink called Limca being sold in at least India?
>
> MR. RANNELLS: Objection as to form.
>
> A. Yes.[139]

Meenaxi Gandhi, Respondent's President and namesake, testified that she had "heard about Limca," and knew it was a drink.[140] Clearly, Respondent was aware of Petitioner's LIMCA lemon-lime soda/soft drink prior to Respondent's adoption of the word mark for its lemon-lime soda. Respondent claims that Kaushik Gandhi searched the USPTO database and "several U.S. Indian grocers," and found a registration for LIMCA for soft drinks owned by Petitioner that expired in 1996.[141]

In addition, as with THUMS UP, Respondent's activity with LIMCA went beyond mere selection of the famous name of a soda from India. Respondent developed a logo that strongly resembles the one used by Petitioner and its predecessor-in-interest for decades in India. Respondent's specimen of use with the application underlying its registration shows a logo very similar to Petitioner's:

---

[138] 75 TTABVUE 345 (Sundarraj Deposition); *see also* 75 TTABVUE 155-56 (Kaushik Gandhi Deposition, with similar testimony).

[139] 75 TTABVUE 346 (Sundarraj Deposition).

[140] 75 TTABVUE 452 (Meenaxi Gandhi Deposition).

[141] 110 TTABVUE 14; 75 TTABVUE 39.



 (Respondent's specimen)[142] and (Petitioner's logo).[143]

Respondent alleges that this logo was independently developed:

> Kaushik Gandhi worked with the manufacturer to come up with a label design. Mr. Gandhi's concept for the label (namely, green color for the lime and red color for the ribbon) was provided to the manufacturer (Arvind Phalanke) who then created the original label, including its layout.[144]

Mr. Gandhi also testified that he "developed this independently without knowing about any design Coca-Cola used for its own Limca product," and he did not know why it looked like the logo used by Petitioner.[145] He and Ms. Sundarraj testified that

---

[142] 75 TTABVUE 48 (Respondent's Answer to Interrogatory No. 20); *id.* at 19 (Kaushik Gandhi Deposition).

[143] 75 TTABVUE 494.

[144] 75 TTABVUE 39 (Respondent's Answer to Interrogatory No. 4).

[145] 75 TTABVUE 165 (Kaushik Gandhi Deposition).

Respondent developed the design to resemble a gift tied with a ribbon.[146] The logo remained in use by Respondent for approximately five or six years.[147] Once again, we doubt the credibility of the testimony that Respondent independently created the LIMCA word mark and independently developed a logo so strikingly similar to Petitioner's.[148]

### 3. Other Marks

Finally, in considering the nature of Respondent's activities, and whether they rise to the level of deliberate passing off of Respondent's goods as those of another, we take into account Respondent's larger pattern of adopting marks challenged by others as confusingly similar and on other grounds.[149] When asked about such challenges, Kaushik Gandhi agreed that there were "four instances in which a third party has alleged that Meenaxi has adopted that third party's mark for Meenaxi's own use."[150] He named RASNA, REAL NAMKEEN, BOURNVITA and NUTRELA as examples of marks Respondent applied to register that were challenged by third parties who alleged that Respondent adopted and used on related goods the third

---

[146] 75 TTABVUE 144 (Kaushik Gandhi Deposition); 75 TTABVUE 353 (Sundarraj Deposition).

[147] 75 TTABVUE 147 (Kaushik Gandhi Deposition).

[148] While screenshots promoting other lemon-lime beverages submitted by Respondent show some use by third-parties of green and red in their logos and trade dress, none show designs similar to those used by Petitioner or Respondent for LIMCA. 100 TTABVUE 1-10.

[149] E.g., 75 TTABVUE 16-76; 80 TTABVUE 8-12, 40-43, 59-63; 76 TTABVUE 372-583; 82 TTABVUE 1-213.

[150] 75 TTABVUE 165 (Kaushik Gandhi Deposition).

parties' marks.[151] Malathi Sundarraj also identified a trademark dispute over another "house brand" of Respondent's, called "Idhayam."[152]

Examples in the record of such challenged marks include:

- , the subject of Cancellation No. 92057584, involving the pleaded mark, , in which judgment was entered in favor of the petitioner after Respondent Meenaxi surrendered its registration without consent.[153] With regard to this mark, Kaushik Gandhi testified "I had heard about Rasna in India, but when I search here in America, I did not find that mark in America. And we did not see that in market. And then when we look research [sic] into USPT [sic] it was available. So based on that we ak [sic] our lawyer to apply for that."[154]

- , the subject of Opposition No. 91210494, involving the pleaded mark NUTRELA, in which the opposer's motion for summary judgment was granted.[155] Respondent's corporate designee testified that

---

[151] 75 TTABVUE 160-61 (Kaushik Gandhi Deposition).

[152] 75 TTABVUE 262.

[153] 75 TTABVUE 62 (Respondent's Answer to Interrogatory No. 10); 76 TTABVUE 407-20.

[154] 75 TTABVUE 136 (Kaushik Gandhi Deposition).

[155] 75 TTABVUE 62-63 (Respondent's Answer to Interrogatory Nos. 9 & 10).

Kaushik Gandhi came up with the word mark for NUTRELA, and then Mr. Shah came up with the design.[156] She further confirmed that "at the time Mr. Kaushik came up with the name Nutrella [sic], … Meenaxi Enterprise [was] aware that there was a product sold in India under the name Nutrella [sic]."[157]

-  , the subject of Opposition No. 91211285, involving the pleaded mark  , in which judgment was entered in favor of the opposer after Respondent Meenaxi withdrew its application without consent.[158] Respondent's corporate designee testified that Kaushik Gandhi came up with the word mark for REAL NAMKEEN, and then Mr. Shah came up with the design.[159]

- , the subject of Opposition No. 91210903, involving the pleaded marks BOURNVITA "in the exact design format shown in the opposed application," in which judgment was entered in favor of the opposer after Respondent Meenaxi withdrew the application.[160]

---

[156] 75 TTABVUE 320 (Sundarraj Deposition).

[157] 75 TTABVUE 321 (Sundarraj Deposition).

[158] 75 TTABVUE 62 (Respondent's Answer to Interrogatory No. 9); 76 TTABVUE 476-91.

[159] 75 TTABVUE 320 (Sundarraj Deposition).

[160] 75 TTABVUE 61 (Respondent's Answer to Interrogatory No. 9); 76 TTABVUE 435-49 (quoted language from 76 TTABVUE 440).

- BOURNVITA, the subject of Opposition No. 91210904, involving the pleaded mark BOURNVITA, in which judgment was entered in the opposer's favor following Respondent Meenaxi's default.[161]

- BHAVANI and BHAVANI'S NATURE FRESH, the subjects of Opposition Nos. 91173720 and 91173648, involving the pleaded marks BHAVANI and BHAVANI and design, which oppositions were dismissed without prejudice following Respondent Meenaxi's withdrawal of its applications with consent.[162]

In several instances, the marks relied on as a basis for opposition or cancellation included color, stylization and design elements, and the proposed marks that Respondent sought to register were essentially identical, employing the same or very similar color, stylization and design elements.[163] "Given the number of applications that [Respondent] has filed seeking registration of [third-party] marks, we find it highly unlikely that adoption of these marks was an unintended coincidence. To the contrary, this evidence strongly suggests that [Respondent sought these registrations] and others in an effort to trade off of the goodwill of the prior registrants." *L'Oreal S.A. v. Marcon*, 102 USPQ2d 1434, 1442 (TTAB 2012).

Respondent attempts to explain away some of these examples with the same rationale provided for using Petitioner's logos, stating in an interrogatory response as follows:

---

[161] 76 TTABVUE 450-64.

[162] 75 TTABVUE 61-62 (Respondent's Answer to Interrogatory No. 9); 76 TTABVUE 492-503.

[163] 76 TTABVUE 372-583.

> Registrant did engage the services of Raju Shah in 2012 to create certain designs for use on labels (i.e., Rasna, Real Namkeen, Nutrela, and Thums Up). Those designs became the subject of opposition and cancellation proceedings. As a result of the filing of the oppositions and petitions to cancel, Registrant became aware the [sic] Raju Shah had copied, in whole or in part, from logos of others. Upon learning of the same, Registrant discontinued use of said logos. The logos created by Raju Shah were:

  





 

.[164]

Respondent's reliance on repeated alleged "rogue" copying by its label designer

conspicuously omits at least one of the challenged marks, and does not account for

the resemblance of Respondent's first LIMCA logo,  to Petitioner's,

. Respondent's corporate designee emphasized that Mr. Shah did not have

---

[164] 75 TTABVUE 63-64 (Respondent's Answer to Interrogatory No. 11).

"any role with respect to any design for the Limca mark."[165] Moreover, the testimony set forth above in connection with Respondent's selection of the RASNA and NUTRELA word marks shows that it was Respondent's own co-founder and Vice President Kaushik Gandhi who selected those marks with prior knowledge of their use by third parties as marks for goods in India. Ultimately, we find Respondent's reliance on allegedly unauthorized misdeeds by Mr. Shah with respect to the third-party marks utterly unpersuasive. We find that Respondent participated directly in a pattern of copying for use in the United States third-party marks with which Respondent was familiar from products in India, and a further pattern of creating similar logos, which pattern includes the marks at issue here. *See id.* ("Applicant's demonstrated pattern of filing applications to register various well-known marks convinces us that applicant's adoption of the L'OREAL PARIS mark was in bad faith, with the intention to trade off of opposer's famous L'OREAL and L'OREAL PARIS marks").

### D. Analysis

Following the analysis in *Belmora*, we first find that when Respondent adopted the marks at issue, it was well aware of Petitioner's THUMS UP cola and LIMCA lemon-lime soft drink in India. Just as in *Belmora*, 110 USPQ2d at 1633, we find that Respondent's explanation and testimony regarding its selection of the marks and its development of the accompanying logos and tagline are simply not credible. Second, the record shows that Respondent used highly similar logos and trade dress

---

[165] 75 TTABVUE 367 (Sundarraj Deposition).

accompanying both the THUMS UP and LIMCA to Petitioner's logos and trade dress for its THUMS UP and LIMCA products in India. "Respondent thus adopted petitioner's identical source-identifying mark[s] and logo[s], and … highly similar package design[s]." *Id.* at 1634. We find that Respondent's logos and tagline were part and parcel of its effort to "deceive the public by its labeling and packaging practices" in a manner indicative of misrepresentation of source. *McDonnell Douglas*, 228 USPQ at 47.

In *Belmora*, the record included additional evidence that the respondent and its agents explicitly "invoked the reputation" of the petitioner's product in a manner not present in this case, 110 USPQ2d at 1634. However, we find other facts in this case more than sufficiently persuasive for us to infer that Respondent deliberately misrepresented the source of these goods to consumers. Indeed, against the backdrop of Respondent's admitted knowledge of Petitioner's marks and its history of adopting other third-party marks, Respondent's marks and logos effectively speak for themselves. Notably, Respondent's distribution channels focus on Indian groceries in the United States, specifically targeting the Indian-American consumers likely to be familiar with Petitioner's THUMS UP and LIMCA beverages, which are well known in India. Kaushik Gandhi confirmed that the Indian-American community is the company's "primary source of distribution,"[166] and Respondent's Brief states that its goods generally are "distributed primarily to Indian grocers in the United States."[167]

---

[166] 75 TTABVUE 98-99.

[167] 110 TTABVUE 12 (Respondent's Brief); *see also* 75 TTABVUE 255-56 (Malathi Sundarraj testifying that Meenaxi distributes primarily to Indian grocers as its customers).

*See Belmora*, 2021 USPQ2d 126, at \*\*2 ("Belmora's early marketing materials targeted Hispanic American consumers familiar with FLANAX").

In addition, Respondent did not merely adopt the identical marks, highly similar logos, and identical "Taste the Thunder" tagline for beverages in general, but also selected THUMS UP for the same type of beverage – a cola – as Petitioner's, and selected LIMCA for the same type of beverage – a lemon-lime soda – as Petitioner's. *Cf. Converse, Inc. v. Int'l Trade Comm'n*, 909 F.3d 1110, 128 USPQ2d 1538, 1546 (Fed. Cir. 2018) (intentional copying indicative of consumer recognition of the mark as a source indicator); *Perfect Fit Indus., Inc. v. Acme Quilting Co.*, 618 F.2d 950, 205 USPQ 297, 301 (2d Cir. 1980) ("If there was intentional copying the second comer will be presumed to have intended to create a confusing similarity…."); *Edom Labs., Inc. v. Lichter*, 102 USPQ2d 1546, 1554 n.31 (TTAB 2012) (adoption of trade dress similar to senior mark holder may provide evidence of intent to confuse). Additionally, Respondent's corporate designee answered in the affirmative when asked whether Respondent "ever had any customer comment that the mark -- that any mark [Respondent] used for its own Thums Up jeera masala lemon masala, is a mark they had seen in use in India?"[168] Respondent's course of conduct belies its excuses that consumers in the United States are not aware of Petitioner's marks,[169] because Respondent's conduct clearly sought to capitalize on this awareness.

---

[168] 75 TTABVUE 373 (Sundarraj Deposition).

[169] We reject Respondent's contention, based on a concurring opinion in *Grupo Gigante S.A. de C.V. v. Dallo & Co.*, 391 F.3d 1088, 73 USPQ2d 1258, 1272 (9th Cir. 2004) (Graber, J., concurring) involving trademark infringement and other claims, that "50% consumer awareness is the proper baseline," and that the lack of a survey from Petitioner in this case

We also consider it significant that Respondent's activities in connection with THUMS UP and LIMCA are not isolated instances, but instead form part of a broader pattern of copying the word marks and logos of others, particularly brands from India. We find from the testimony and evidence set forth above, and infer from the identical natures or striking similarities of some of the other marks, that Respondent deliberately selected and applied to register third-party marks. Respondent's behavioral pattern reinforces our finding that Respondent deliberately misrepresented the source of its goods under the THUMS UP and LIMCA marks.

Respondent emphasizes its alleged priority of use in the United States in its Brief, but acknowledges that Petitioner need not establish priority for its misrepresentation of source claim based on Petitioner's reputation in the United States.[170] As the Fourth Circuit Court of Appeals held, "neither § 14(3) nor *Lexmark* mandate that the plaintiff have used the challenged mark in United States commerce as a condition precedent to its claim." *Belmora*, 819 F.3d at 715 (citing *Empresa Cubana Del Tabaco v. Gen. Cigar Co.*, 753 F.3d 1270, 1278 (Fed. Cir. 2014) ("In the proceedings before the Board, however, Cubatabaco need not own the mark to cancel the Registrations under [Section 14(3)].")).

---

is fatal to its claim. 110 TTABVUE 35 (Respondent's Brief). We decline to read such a requirement into a misrepresentation of source claim. *See Belmora*, 110 USPQ2d at 1635 (finding based on the nature of respondent's marketing that the foreign mark "is known among the U.S. retailers and Hispanic consumers to whom respondent markets its products"). Moreover, while a valid survey can be persuasive evidence, we have declined to find that one is necessary in a Board proceeding. *E.g.*, *Fort James Operating Co. v. Royal Paper Converting, Inc.*, 83 USPQ2d 1624 (TTAB 2007) ("Surveys … are not required in Board proceedings which determine the right to register only.") (citation omitted).

[170] 110 TTABVUE 22 (Respondent's Brief).

Respondent's Brief also includes a section arguing against recognition of "what is referred to as the 'famous marks' exception to the long-standing territoriality doctrine."[171] However, such an exception is not at issue in this case, as expressly conceded by Petitioner.[172] The misrepresentation of source claim arises by statute from Respondent's activity in the United States. *Belmora,* 110 USPQ2d at 1631 (noting that the misrepresentation of source claim does not depend on the petitioner's foreign activity, but rather on "respondent's own use … in the United States").

The record as a whole demonstrates Respondent's intent to cause consumers exposed to Respondent's use of the THUMS UP and LIMCA marks to draw the logical conclusion that Respondent's products in the United States are licensed or produced by the source of the same types of cola and lemon-lime soda sold under these marks for decades in India. *See id.* (citing *W. Fla. Seafood Inc. v. Jet Rests. Inc.*, 31 F.3d 1122, 31 USPQ2d 1660, 1663 (Fed. Cir. 1994) (stating that evidence should be considered as a whole, "as if each piece of evidence were part of a puzzle")). Ultimately, Respondent's activity constitutes exactly the type of "blatant misuse of … mark[s] … in a manner calculated to trade on the goodwill and reputation of" others that is contemplated under the misrepresentation of source statute. *Otto Int'l*, 83 USPQ2d at 1863.

---

[171] 110 TTABVUE 32.

[172] 113 TTABVUE 11.

## VI.    Conclusion

The Petition for Cancellation is granted as to both registrations on the ground of misrepresentation of source. Registration Nos. 4205598 and 4205597 will be cancelled in due course.